NEW LIFECARE HOSPITALS OF CHESTER
COUNTY LLC, et al.,

               Plaintiffs,

       v.                             Civ. No. 19-705 (EGS)

ALEX M. AZAR II, Secretary of
Health and Human Services

               Defendant.

## MEMORANDUM OPINION

This case concerns the Medicare system, a federal program that helps to cover the cost of providing medical care to qualified individuals. Under Medicare, the government generally reimburses hospitals at a predetermined fixed rate whenever a patient is discharged, regardless of the actual cost of services. Because some hospital stays will be exceptionally costly, Congress has allowed for a high cost outlier ("HCO") which offsets extremely high costs that a hospital may incur when treating certain cases. In such cases, provided that statutory conditions are met, the hospital simply requests additional payment. However, Congress has mandated that these payments cannot increase the payment obligations of the federal government to an amount that is higher than the predetermined prospective rates. In other words, the government calculates an amount it expects to pay based on the number of expected

discharges at the prospective payment rate; and the hospital's requests for additional payments due to HCOs cannot increase that amount. *Id.* Therefore, to keep the budget neutral, the government reduces the prospective payment rate by a percentage based on the expected outlier payments for that year. This reduction is commonly referred to as the budget neutrality adjustment ("BNA").

Plaintiffs, a group of over 100 long-term care hospitals ("LTCH"), bring this action pursuant to, *inter alia*, the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, alleging that defendant Alex M. Azar II, Secretary of Health and Human Services ("HHS") applies the BNA to LTCH stays in an unlawfully duplicative manner. Specifically, this lawsuit challenges a final rule that defines how the budget neutrality adjustment is applied to LTCH hospital stays that are paid out at a site neutral rate. Plaintiffs allege that, because the formula to calculate the site neutral rate already takes into account a 5.1 percent adjustment for the expected HCO payments, the Secretary incorrectly applies a 5.1 percent budget neutrality adjustment to site neutral rates. Thus, plaintiffs argue the Secretary's actions are duplicative and therefore violate the APA.

Pending before the Court are the parties' cross-motions for summary judgment. The parties agree that the formula for site neutral payments is mandated by Congress, and that CMS may apply

a BNA to site neutral payments to insure the government's overall LTCH payment obligations are not increased due to the cost outlier payments. The parties also agree that there are multiple BNAs that play a role in the formula to determine the site neutral rate. Where the parties disagree is whether the BNA applied to the site neutral rate is duplicative or merely a reasonable application of the Secretary's authority to balance the budget. Upon careful consideration of the parties' submissions, the applicable law, and the entire record herein, the Court finds that the Secretary's methodology in applying the BNA to site neutral LTCH stays is a reasonable interpretation of the applicable statues and regulations. Therefore, the Court **GRANTS** defendant's cross-motion for summary judgment, and **DENIES** the plaintiffs' motion for summary judgment.

## I. Background

### A. Statutory and Regulatory Background

#### 1. Medicare Reimbursements to Hospitals

The Centers for Medicare and Medicaid Services ("CMS"), a division of HHS, is in charge of administering the Medicare program under the direction of the Secretary. Until 1983, Medicare reimbursed participating hospitals for inpatient services provided to Medicare patients based on the "reasonable costs" incurred by the hospital. *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1227 (D.C. Cir. 1994). Concerned about

escalating costs, Congress, in 1983, directed HHS to implement a prospective payment system under which hospitals would not receive actual costs, but rather would receive fixed payments based on the type of inpatient services rendered. *Id.* "Congress designed this system to encourage health care providers to improve efficiency and reduce operating costs." *Id.*

CMS pays most hospitals for inpatient services furnished to Medicare beneficiaries at these fixed rates through the Inpatient Prospective Payment System (IPPS"). *See generally Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 49 (D.C. Cir. 2015). The IPPS divides medical conditions into categories of related illnesses called "diagnosis-related groups" ("DRGs"). *Dist. Hosp. Partners*, 786 F.3d at 49. Once a Medicare beneficiary is discharged under IPPS, Medicare reimburses the hospital at a preset rate that depends on the patient's DRG and other factors not relevant to this case. *See* 42 U.S.C. §§ 1395ww(d),(g); 42 C.F.R. §§ 412.64, 412.312; *Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 205-06 (D.C. Cir. 2011)(explaining prospective payment rate calculation). The payment amount for each DRG is intended to reflect the estimated average cost of treating a patient whose condition falls within that DRG, *see* 42 U.S.C. § 1395ww(d), even though the actual cost the hospital incurs in treating that patient may be higher or lower.

This case concerns long-term care hospital reimbursements. In 1999, Congress directed the Secretary to "develop a per discharge prospective payment system for payment for inpatient hospital services of long-term care hospitals[.]"[1] Medicare, Medicaid, and SCHIP Balanced Budget Refinement Act of 1999 ("BBRA"), Pub. L. No. 106-113, § 123, 113 Stat. 1501, 1501A330 (1999)(codified at 42 U.S.C. § 1395ww, note). Congress also mandated that this payment system "shall maintain budget neutrality." *Id.* The following year, Congress further provided that the Secretary "shall examine and may provide for appropriate adjustments to the long-term hospital payment system, including . . . outliers[.]" Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000 ("BIPA"), Pub. L. No. 106-554, § 307(b)(1), 114 Stat. 2763, 2763A497 (2000)(codified at 42 U.S.C. § 1395ww, note).

Because some inpatient stays will be exceptionally costly, Congress provided for additional "high cost outlier" payments to partly offset extremely high costs that hospitals incur in both inpatient and LTCH settings. *See* 42 U.S.C. § 1395ww(d) (5)(A)(ii). Accordingly, a qualifying hospital may request additional payments for outlier cases in certain statutorily

---

[1] The prospective payment system implemented in 1983 did not apply to LTCH which continued to be paid for inpatient services at a reasonable rate.

defined circumstances. *Id.* These outlier payments, however, cannot be projected to increase the overall Medicare payment obligations of the federal government. *See id.* § 1395ww(d)(3)(B). Therefore, to account for the higher outlier payments, CMS reduces the IPPS and LTCH payment rates by, each fiscal year, prospectively estimating the proportion of outlier payments and then prospectively reducing those rates to account for the outlier payments. *Id.* This rate must be projected to be between 5 and 6 percent of the total projected IPPS payments for that year. *Id.* § 1395ww(d)(5)(A)(iv).

### 2. Reimbursement for LTCHs Under Dual-Rate System

The Medicare reimbursement system for LTCHs, the LTCH PPS, is based on different levels of cost than the inpatient hospital prospective payment system. For a hospital to be reimbursed under the LTCH PPS, it must have an average Medicare inpatient length of stay that is greater than twenty-five days, which reflects the medically complex cases treated in LTCHs. *See* Pl.s' Mot. ECF No. 21 at 15. Each patient discharged from a LTCH is assigned to a distinct Medicare severity long-term care diagnosis related group ("MS-LTC-DRG"), and the LTCH is generally paid a predetermined fixed amount applicable to the assigned MS-LTC-DRG (adjusted for area wage differences). *Id.* Although the DRG's for LTCH's are the same as DRG's for acute care hospitals, the weights assigned to the groups are generally

higher. Additionally, the federal standard rate has been much
higher for LTCH's than for acute care hospitals because of the
complexity of the cases and the longer average length of stay.
*Id.* The payment amount for each MS-LTC-DRG is intended to
reflect the average cost of treating a Medicare patient assigned
to that MS-LTC-DRG in a LTCH. *Id.*

CMS implemented the LTCH PPS on October 1, 2002, which
marked the beginning of Federal Fiscal Year 2003. 67 Fed. Reg.
55954 (Aug. 30, 2002). The Secretary modeled the LTCH PPS after
IPPS. *See generally* 42 C.F.R. ch. IV, subch. B, pt. 412, subpt.
O (setting forth the rules governing LTCH PPS). As in IPPS, the
Secretary established a flat national rate for LTCH PPS, now
known as the "standard Federal rate." *Id.* § 412.523(c)(1). This
was the rate that LTCHs received upon patient discharge
depending on the patient's DRG.

In 2013, Congress implemented a dual rate structure for
LTCHs. Concerned that LTCHs were admitting some patients who
instead could be safely and efficiently treated in a lower-cost
setting, Congress required the Secretary to create a separate
payment rate for such patients that would generally be lower
than the standard Federal rate, known as the "site neutral"
rate. *See* Bipartisan Budget Act of 2013, Pub. L. No. 113-67, §
1206, 127 Stat. 1165; 80 Fed. Reg. 49326, 49601-23 (Aug. 17,
2005). Pursuant to this congressional mandate, CMS implemented

this dual-rate payment structure for the LTCH PPS in 2015 (for Fiscal Year 2016), and the structure remains in place today.

Under this dual-rate structure, generally a LTCH is no longer reimbursed at the standard Federal rate if the patient did not spend at least three days in a hospital's intensive care unit immediately preceding the LTCH care, or did not receive at least 96 hours of respiratory ventilation services during the LTCH stay. 42 U.S.C. § 1395ww(m)(6)(A). If the patient does not meet either of these criteria then the hospital gets the site neutral rate which is statutorily defined as the lower of (1) "the IPPS comparable per diem amount determined under [42 C.F.R. § 412.529(d)(4)], including any applicable outlier payments under [42 C.F.R. § 412.525]" or (2) "100 percent of the estimated cost for the services involved." 42 U.S.C. § 1395ww(m)(6)(B)(ii); *see also* 42 C.F.R. § 412.522(c)(1).

The "IPPS comparable per diem amount" is at the heart of the dispute in this case. The amount is determined based on a formula that uses IPPS rates –- the operating IPPS standardized amount and the capital IPPS Federal rate -- for the calculation. *See* 42 C.F.R. § 412.529(d)(4). Those IPPS rates are nationally-applicable values set annually by CMS through a complex computation. *See* 83 Fed. Reg. at 41724-25 (identifying FY 2019 operating standardized amounts); *id.* at 41729 (identifying FY 2019 capital Federal rate). The rates reflect the application of

several adjustments, *see id.* at 41712-13, 41727-29, including the IPPS BNA for outliers, *see id.* at 41723, 41728; *see also* 42 C.F.R. § 412.64(f) (IPPS BNA is applied when calculating standardized amount); *id.* § 412.308(c)(2) (IPPS BNA is applied when calculating Federal rate). After the site neutral rate is calculated, CMS makes certain adjustments including an adjustment to account for outlier payments paid to site neutral cases in the LTCH PPS. 42 C.F.R. § 412.552(c)(2); *id.* § 412.525(a).

Finally, the regulations provide a framework through which a provider can appeal the Secretary's reimbursement decision. Hospitals' payments for Medicare services are calculated and processed by Medicare administrative contractors. *See* 42 U.S.C. § 1395h(a). After receiving a determination as to the amount of a hospital's payments, the hospital can appeal the determination to the Provider Reimbursement Review Board ("PRRB" or "Board"), an administrative tribunal within HHS. *Id.* § 1395oo(a); *see also id.* § 1395oo(b)(providing for group appeals by multiple providers). If a hospital believes the PRRB lacks authority to decide a "question of law or regulation[] relevant to the matters in controversy," it can request that the PRRB make a determination "that it is without authority to decide the question" and authorize expedited judicial review in federal district court. *Id.* § 1395oo(f)(1). In seeking the PRRB's

authorization, the Medicare provider must specify each "question of law or regulations" that it intends to present to the district court. *Id.* The regulation implementing the statute similarly speaks of a provider obtaining review of individual "legal question[s]." 42 C.F.R. § 405.1842(a)(1); *see also id*. § 405.1842(g)(2) ("If the Board grants[expedited judicial review], the provider may file a complaint in a Federal district court in order to obtain [judicial review] of the legal question.").

### B. Procedural Background

#### 1. CMS Rule Making FY 2016–2019

Since the implementation of the site neutral payment rate to LTCHs, plaintiffs have attempted to alert the Secretary that his actions in applying the BNA to the site neutral rate were, in their view, unlawful. When the rule was first proposed in Fiscal Year 2016 "[c]ommenters objected to the proposed site neutral payment rate HCO budget neutrality adjustment, claiming that it would result in savings [to Medicare] instead of being budget neutral." 80 Fed. Reg. at 49622. "The commenters' primary objection was based on their belief that, because the IPPS base rates used in the IPPS comparable per diem amount calculation of the site neutral payment rate include a budget neutrality adjustment for IPPS HCO payments (for example, a 5.1 percent adjustment on the operating IPPS standardized amount), an 'additional' budget neutrality factor is not necessary and is,

in fact, duplicative." *Id.* CMS disagreed and explained why it

believed that there was no duplication:

> While the commenters are correct that the IPPS
> base rates that are used in site neutral
> payment rate calculation include a budget
> neutrality adjustment for IPPS HCO payments,
> that adjustment is merely a part of the
> calculation of one of the inputs (that is, the
> IPPS base rates) that are used in the LTCH PPS
> computation of site neutral payment rate. The
> HCO budget neutrality factor that is applied
> in determining the IPPS base rates is intended
> to fund estimated HCO payment made under the
> IPPS, and is therefore determined based on
> estimated payments made under the IPPS. As
> such, the HCO budget neutrality factor that is
> applied to the IPPS base rates does not
> account for the additional HCO payments that
> would be made to site neutral payment rate
> cases under the LTCH PPS.

*Id.* CMS further explained why it believed the 5.1 percent BNA

was necessary to account for outlier payments in LTCH PPS:

> Without a budget neutrality adjustment when
> determining payment for a case under the LTCH
> PPS, any HCO payment payable to site neutral
> payment rate cases would increase aggregate
> LTCH PPS payments above the level of
> expenditure if there were no HCO payments for
> site neutral payment rate cases. Therefore,
> our proposed approach appropriately results in
> LTCH PPS payments to site neutral payment rate
> cases that are budget neutral relative to a
> policy with no HCO payments to site neutral
> payment rate cases.

*Id.*

The commenters renewed their objections in Fiscal Year

2017, arguing that the proposed 5.1 percent BNA for the LTCH

site neutral payment rate was duplicative. CMS responded with

the following explanation:

> Section 1206 of Public Law 113-67 defined the
> site neutral payment rate as the lower of the
> estimated cost of the case or the IPPS
> comparable per diem amount determined under
> paragraph (d)(4) of § 412.529, including any
> applicable outlier payments under § 412.525.
> The term "IPPS comparable per diem amount" was
> not new at the time of enactment. That term
> had already previously been defined under §
> 412.529(d)(4), which has been in effect since
> July 1, 2006, and used as a component of the
> payment adjustment formula for LTCH PPS SSO
> [short stay outlier] cases. From the July 1,
> 2006 inception of the IPPS comparable
> component of the LTCH PPS' SSO payment
> formula, we have budget neutralized the
> estimated HCO payments that we expected to pay
> to SSO cases including those paid based on the
> IPPS comparable per diem amount. Congress was
> also well aware of how we had implemented our
> "IPPS comparable per diem amount" concept in
> the SSO context at the time of the enactment
> of section 1206 of Public Law 113-67. As such,
> we believe Congress left us with the
> discretion to continue to treat the "IPPS
> comparable per diem amount" in the site
> neutral payment rate context as we have
> historically done with respect to LTCH PPS HCO
> payments made to discharges paid using the
> "IPPS comparable per diem amount," that is, to
> adopt a policy in the site neutral context to
> budget neutralize HCO payments made to LTCH
> PPS discharges including those paid using the
> "IPPS comparable per diem amount."

81 Fed. Reg. 56762, 57308 (Aug. 22, 2016). CMS further explained

why it believed that applying a BNA to the site neutral rate is

consistent with its treatment of standard Federal rate within

the LTCH PPS:

> We have made a budget neutrality adjustment
> for estimated HCO payments under the LTCH PPS
> under § 412.525 every year since its inception
> in FY [Federal fiscal year] 2003.
> Specifically, at § 412.523(d)(1), under the
> broad authority provided by section 123 of
> Public Law 106-113 and section 307 of Public
> Law 106-554, which includes the authority to
> establish adjustments, we established that the
> standard Federal rate (now termed the LTCH PPS
> standard Federal payment rate under the new
> dual rate system) would be adjusted by a
> reduction factor of 8 percent, the estimated
> proportion of outlier payments under the LTCH
> PPS (67 FR 56052). Thus, Congress was well
> aware of how we had implemented our HCO policy
> under the LTCH PPS under § 412.525 at the time
> of the enactment of section 1206 of Public Law
> 113-67.

*Id.*

CMS proposed the same 5.1 percent BNA for the LTCH site neutral payment rate, and received similar objections as it did in prior years. Compl., ECF No. 1 ¶ 31. CMS explained its disagreement:

> As we discussed in response to similar
> comments (81 FR 57308 through 57309 and 80 FR
> 49621 through 49622), we have the authority to
> adopt the site neutral payment rate HCO policy
> in a budget neutral manner. More importantly,
> we continue to believe this budget neutrality
> adjustment is appropriate for reasons outlined
> in our response to the nearly identical
> comments in the FY 2017 IPPS/LTCH PPS final
> rule (81 FR 57308 through 57309) and our
> response to similar comments in the FY 2016
> IPPS/LTCH PPS final rule (80 FR 49621 through
> 49622).

82 Fed. Reg. 37990, 38545-38546 (Aug. 14, 2017).

For Fiscal Year 2019, commenters similarly objected to
CMS's proposal of a 5.1% BNA for the LTCH site neutral payment
rate. Compl. ¶¶ 34-36. CMS responded as follows:

> We continue to disagree with the commenters
> that a budget neutrality adjustment for site
> neutral payment rate HCO payments is
> inappropriate, unnecessary, or duplicative.
> As we discussed in response to similar
> comments (82 FR 38545 through 38546, 81 FR
> 57308 through 57309, and 80 FR 49621 through
> 49622), we have the authority to adopt the
> site neutral payment rate HCO policy in a
> budget neutral manner. More importantly, we
> continue to believe this budget neutrality
> adjustment is appropriate for reasons
> outlined in our response to the nearly
> identical comments in the FY 2017 IPPS/LTCH
> PPS final rule (81 FR 57308 through 57309)and
> our response to similar comments in the FY
> 2016 IPPS/LTCH PPS final rule (80 FR 49621
> through 49622).

83 Fed. Reg. 41144, 41738 (Aug. 17, 2018). CMS finalized the
proposal in August 2018, and the Rule became effective on
October 1, 2018.

Fiscal Year 2020 is of significant importance to this case.
To allow LTCHs to transition to the dual rate payment structure,
Congress directed that for discharges in cost reporting periods
beginning in Fiscal Year 2019 or earlier, LTCHs are to be paid
at a blended rate for site neutral cases, 42 U.S.C. §
1395ww(m)(6)(B)(i)(I), which is equal to one-half of the site
neutral payment rate and one-half of the LTCH PPS standard
Federal payment rate, *id.* § 1395ww(m)(6)(B)(ii). Effective for

discharges in cost reporting periods beginning in Fiscal Year
2020 or later, site neutral cases will be paid at 100 percent of
the site neutral payment rate, which is a significant decrease
from the blended rate.

## 2. Administrative Appeal and Civil Law Suit

Plaintiffs had hoped that CMS would correct the alleged
errors before the end of the LTCH site neutral transition period
(*i.e.*, before September 30, 2019). Failing to persuade CMS to
change its position on its methodology in its application of the
BNA to site neutral LTCH payment rates, plaintiffs filed an
appeal with the PRRB. *See* Administrative Record ("AR"), ECF No.
27-1 at 83-84. In its appeal, plaintiffs filed a Request for
Expedited Judicial Review "challenging a budget neutrality
adjustment published in the August 17, 2018 FY 2019 IPPS/LTCH
PPS Final Rule." *Id.* at 83.

The Board determined that it was "without authority to
decide the legal question of [whether] the Secretary incorrectly
applied the [BNA] twice to the LTCH site neutral case payments
for FFY 2019 as delineated in the August 17, 2018 Federal
Register." AR, ECF No. 27-1 at 7. Accordingly, the board granted
the plaintiffs' Request for Expedited Judicial Review "for the
issue and the subject year." *Id.*

Plaintiffs then filed this Complaint challenging the
alleged duplicative BNA on March 13, 2019. *See* Compl., ECF No.

1. On April 5, 2019, Plaintiffs filed an application for a preliminary injunction with this Court to prevent CMS from applying the duplicative BNA during this litigation. *See* PI Mot., ECF No. 8. The parties consented to a consolidation of the motion for injunctive relief with a hearing on the merits pursuant to Fed. R. Civ. P. 65(a)(2), thereby converting plaintiffs' motion to one for summary judgment.[2] The parties have fully briefed the issues in their cross-motions for summary judgment. This case is ripe for adjudication.

## II. Legal Standard

Although both parties have moved for summary judgment, the parties seek review of an administrative decision under the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 706. Therefore, the standard articulated in Federal Rule of Civil Procedure 56 is inapplicable because the Court has a more limited role in reviewing the administrative record. *Wilhelmus v. Geren*, 796 F. Supp. 2d 157, 160 (D.D.C. 2011)(internal citation omitted). "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *See Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90

---

[2] Because the Court has consolidated Plaintiffs' preliminary injunction motion with a decision on the merits, the Court "need not decide the preliminary injunction." *Pharm. Research & Mfrs. of Am. v. HHS*, 43 F. Supp. 3d 28, 34 (D.D.C. 2014).

(D.D.C. 2006)(internal quotation marks and citations omitted).

"Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Wilhelmus*, 796 F. Supp. 2d at 160 (internal citation omitted).

Under the APA, a court must set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 738 (D.C. Cir. 2001). Review of agency action is generally deferential, *Blanton v. Office of the Comptroller of the Currency*, 909 F.3d 1162, 1170 (D.C. Cir. 2018)(citing S*afari Club Int'l v. Zinke*, 878 F.3d 316, 325-26 (D.C. Cir. 2017)), as long as the agency examines the relevant facts and articulates a satisfactory explanation for its decision including a "rational connection between the facts found and the choice made." *Motor Vehicle Mfr.'s Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)(citation omitted); *Iaccarino v. Duke*, 327 F. Supp. 3d 163, 177 (D.D.C. 2018). The "scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency." *Iaccarino*, 327 F. Supp. 3d at 173 (internal quotation marks omitted)(citing *State Farm*, 463 U.S. at 43). In Medicare cases, the "'tremendous complexity of the

Medicare statute . . . adds to the deference which is due to the Secretary's decision.'" *Dist. Hosp. Partners*, 786 F.3d at 60 (quoting *Methodist Hospital*, 38 F.3d at 1229); *see also Alaska Airlines, Inc. v. TSA*, 588 F.3d 1116, 1120 (D.C. Cir. 2009) (stating agency decisions involving "complex judgments about . . . data analysis that are within the agency's technical expertise" receive "an extreme degree of deference") (citation omitted).

## III. Analysis

The Court will first address whether it has jurisdiction to hear the claims in this case. After finding that it indeed does have jurisdiction, the Court next turns to the plaintiffs' arguments that the Secretary has violated the APA and other federal laws.

### A. Jurisdiction

"The Medicare Act places strict limits on the jurisdiction of federal courts to decide 'any claims arising under' the Act." *Am. Orthotic & Prosthetic Ass'n, Inc. v. Sebelius*, 62 F.Supp.3d 114, 122 (D.D.C. 2014)(citing 42 U.S.C. § 405(h)) There are two elements that a plaintiff must establish to obtain judicial review. *See Am. Chiropractic Ass'n, Inc. v. Leavitt*, 431 F.3d 812, 816 (D.C. Cir. 2005)("Judicial review may be had only after the claim has been presented to the Secretary and administrative remedies have been exhausted."). First, the plaintiff must have

"presented" the claim to the Secretary; this requirement is not waivable, because without presentment "there can be no 'decision' of any type," which § 405(g) clearly requires. *Mathews v. Eldridge*, 424 U.S. 319, 328 (1976). The second element is the waivable "requirement that the administrative remedies prescribed by the Secretary be exhausted." *Eldridge*, 424 U.S. at 328.

Defendant argues that, with the exception of Fiscal Year 2019, the Court lacks jurisdiction to review plaintiffs' claims because plaintiffs did not present those claims to the PRRB. Def.'s Cross-Mot., ECF No. 22 at 22–25. Plaintiffs counter that the PRRB's decision notes that plaintiffs objected to the alleged duplicative BNA that CMS applied in FY 2016 and subsequent years. Pl.s' Mot., ECF No. 21 at 33. Plaintiffs also point to their Request for Expedited Judicial Review which mentions that Plaintiffs took issue with the BNA from the first year of its adoption in the FY 2016 IPPS/LTCH PPS Final Rule. *Id.* citing (AR at 37–49).

The Court is persuaded that it only has jurisdiction over plaintiffs' claim for Fiscal Year 2019. In this case, although plaintiffs' PRRB Appeal Request and their Request for Expedited Judicial Review mentioned that the Secretary allegedly applied an erroneous BNA to LTCH site neutral payments in years prior to Fiscal Year 2019, plaintiffs only appealed the BNA for Fiscal

Year 2019. AR, ECF No. 27-1 at 83. Their Appeal Request
expressly stated: "The Providers in this group are challenging a
budget neutrality adjustment published in the August 17, 2018 *FY
2019 IPPS/LTCH PPS Final Rule*." *Id.* (emphasis added). Although
plaintiffs noted that they had objected to the prior iterations
of the rule, these objections were not concrete challenges in
the "context of a fiscal year reimbursement claim." *See Three
Lower Ctys. Cmty. Health Servs., Inc. v. U.S. Dep't of Health &
Human Servs.*, 317 Fed. Appx. 1, 3 (D.C. Cir. 2009). Moreover, in
addition to the Appeal Request's focus on Fiscal Year 2019,
plaintiffs' Request for Expedited Judicial Review also focused
on that same year. AR, ECF No. 27-1 at 52. Plaintiffs stated in
their request that the "Providers are directly challenging the
FY 2019 LTCH PPS site neutral HCO budget neutrality adjustment
in the final rule." *Id.*; *see also id.* at 53 ("[T]he legal
question in these appeals is a challenge to the substantive and
procedural validity of a regulation--the BNA in the FY 2019
Final Rule.").

The Court's conclusion that it only has jurisdiction over
plaintiffs' claims regarding FY 2019 is further supported by the
PRRB's jurisdictional requirements. Under PRRB rules, an
applicant is required to file an appeal within 180 days of the
federal fiscal year end, (*i.e.*, September 30), for the claimed
erroneous payment. *See* PRRB Rule 4.3; 7.1 , *see also* AR, ECF No.

27-1 at 83 (referencing 180-day appeal period). Plaintiffs had only done so for FY 2019; indeed they listed the "final agency determination" they were challenging as the "FY 2019 IPPS/LTCH PPS Final Rule." AR, ECF No. 27-1 at 88. Plaintiffs' further acknowledged that the Board had jurisdiction to hear a direct appeal from the Final Rule; *id.*, and it is clear from the record that the only Final Rule that was timely challenged was the FY 2019 IPPS/LTCH PPS Final Rule published in the Federal Register on August 17, 2018. *Id.* Accordingly, the PRRB only had jurisdiction over the FY 2019 Rule, and the fact that the PRRB lacked jurisdiction over any prior fiscal year further supports the Court's finding that the plaintiffs had failed to present their claims for those years. *See id.* at 83 (referencing Fiscal Year 2019 and explicitly stating plaintiffs challenged "FY2019 IPPS/LTCH PPS Final Rule.").[3]

Plaintiffs expressly limited their claim to FY 2019. *Id.* Accordingly, the PRRB granted expedited judicial review only for the Fiscal Year 2019. *Id* at 7. In granting the application, the Board stated the issue as follows: "the legal question of

---

[3] The FY 2020 rule became final on August 16, 2019. 84 Fed. Reg. 42044 (Aug. 16, 2019)  The FY 2020 IPPS/LTCH PPS Final Rule contains budget neutrality adjustments that is identical to the BNAs CMS adopted in FY 2019. Although plaintiffs have failed to present its claim relating to the FY 2020 Rule to the PRRB, they seek to challenge the rule in this lawsuit. The Court need not decide whether this claim is ripe because, as the Court will explain, the identical 2019 FY Rule does not violate the APA.

[whether] the Secretary incorrectly applied the outlier budget neutrality adjustment twice to the LTCH site neutral case payments for FFY [Federal Fiscal Year] 2019 as delineated in the August 17, 2018 Federal Register". *Id.* The PRRB further made the explicit finding that it had "jurisdiction over the matter for the ***subject year*** and the Providers in these appeals are entitled to a hearing before the Board." *Id.* at 6 (emphasis added). Because the only claim that was presented to the PRRB was the claim of alleged erroneous application of the BNA to the Fiscal Year 2019 (i.e., the "subject year"), the Court concludes that it only has jurisdiction to review the issues arising under that claim.[4]

**B. APA Claims**

Plaintiffs advance two general arguments, one procedural and one substantive. Plaintiffs' first argument relates to the requirements for notice and commenting under the APA. The second argument relates to the alleged arbitrary and capricious actions by the Secretary. The Court addresses each issue in turn.

**1. Notice and Comment Obligations**

Plaintiffs' procedural argument is that the Secretary failed to respond adequately to comments about the Secretary's

---

[4] The exhaustion requirement is not at issue in this case, PRRB granted plaintiffs' request for expedited judicial review of the 2018 rule, thereby exhausting plaintiffs' administrative remedies.

methodology for applying the BNA to the LTCH site neutral payment rate. Pl.s' Mot., ECF No. 21 at 40-41. A regulation will be deemed arbitrary and capricious, if the issuing agency fails to address significant comments raised by the challengers to a rule during the notice and comment period. *C.f. PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005)("An agency's failure to respond meaningfully to objections raised by a party renders its decision arbitrary and capricious."). Although an agency "need not address every comment" during the notice and comment period, "it must respond in a reasoned manner to those that raise significant problems." *Huntco Pawn Holdings, LLC v. U.S. Dep't of Defense*, 240 F. Supp. 3d 206, 219 (D.D.C. 2016)(citation and internal quotation marks omitted). However, an agency's obligation to respond to comments related to proposed rulemaking is "not 'particularly demanding.'" *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 441-42 (D.C. Cir. 2012)(quoting *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993)). The agency's response to public comments need only "enable us to see what major issues of policy were ventilated . . . and why the agency reacted to them as it did." *Auto. Parts & Accessories Ass'n v. Boyd*, 407 F.2d 330, 338 (D.C. Cir. 1968). "[T]he failure to respond to comments is significant only insofar as it demonstrates that the agency's decision was not based on a consideration of the relevant

factors." *Texas Mun. Power Agency v. EPA*, 89 F.3d 858, 876 (D.C. Cir. 1996)(citation and internal quotation marks omitted).

Plaintiffs argue that the Secretary's terse "three sentence" response during the notice and comment period for the FY 2019 IPPS/LTCH PPS Final Rule establishes that the agency disregarded major issues raised by commenters about the Secretary's application of the BNA. Pl.s' Mot., ECF No. 21 at 53-54. According to plaintiffs, "[t]here was no effort by CMS to develop a substantive response to the commenters, who provided additional information for CMS to consider and responded to CMS' previous statements, and explain why the BNA is not duplicative of the adjustment already applied to the IPPS payment rate used to determine the IPPS comparable per diem amount." *Id.* at 53

Plaintiffs' contentions are belied by the administrative record in this case. Although plaintiffs disagree with CMS's reasoning, CMS did provide a detailed explanation for why it chose to apply the BNA to site neutral LTCH cases in every fiscal year that the rule was applied. For Fiscal Years 2016-2018, CMS provided a detailed analysis on why it disagreed with the plaintiffs. *See e.g.*, 81 Fed. Reg. 56762, 57308. For Fiscal Year 2019, the only year at issue in this case, CMS expressly referenced CMS's earlier substantive responses and incorporated the "reasons outlined in [CMS's] response to the nearly identical comments in the FY 2017 IPPS/LTCH PPS final rule (81

FR 57308 through 57309) and [CMS's] response to similar comments in the FY 2016 IPPS/LTCH PPS final rule (80 FR 49621 through 49622)." 83 Fed. Reg. at 41738.

For each year CMS received comments regarding the budget neutral adjustment methodology, CMS responded by indicating its reasons for applying the BNA to the LTCH site neutral rate . *See id.* For comments related to FY 2019, because its rationale had not waivered, CMS simply referenced its prior responses to nearly identical comments that it received in prior years. 83 Fed. Reg. 41144 at 41738. This Court finds CMS's acknowledgement and consideration of the comments reasonable. CMS's responses identified the major issues raised by the commenters and stated the main reasons for its decisions. Accordingly, the Secretary did not act arbitrary and capriciously for failure to adequately respond to comments.

## 2. Secretary's Interpretation of the Statute

In reviewing an agency's interpretation of a statute it is charged with administering, a court must apply the framework of C*hevron USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See Halverson v. Slater*, 129 F.3d 180, 184 (D.C. Cir. 1997). Under the familiar *Chevron* two-step test, the first step is to ask "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as

the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778. In making that determination, the reviewing court "must first exhaust the 'traditional tools of statutory construction' to determine whether Congress has spoken to the precise question at issue." *Natural Res. Def. Council, Inc. v. Daley*, 209 F.3d 747, 572 (2000)(citation omitted). The traditional tools of statutory construction include "examination of the statute's text, legislative history, and structure . . . as well as its purpose." *Id.* (internal citations omitted). If these tools lead to a clear result, "then Congress has expressed its intention as to the question, and deference is not appropriate." *Id.*

### a. *Chevron* Step One

The Court's first question is whether Congress has directly spoken to the precise question at issue. As the plaintiffs have pointed out, Congress has not spoken directly on the issue of the methodology for applying the BNA to the LTCH PPS site neutral payment rate. *See* Pl.s' Mot., ECF No. 21 at 37. The statute at issue defines the formula for site neutral payment rate as the lower of the "IPPS comparable per diem amount determined under paragraph (d)(4) of section 412.529(d)(4) of title 42, Code of Federal Regulations, including any applicable outlier payments under 412.15 of such title" or "100% of the estimated cost for the services involved." 42 U.S.C. §

1395WW(m)(6)(B)(ii). The referenced regulation in turn requires
the Secretary to calculate the site neutral payment using the
IPPS standardized amount and the IPPS Federal rate, both of
which incorporate the IPPS BNA. 42 C.F.R. 412.529(d)(4).
However, the statute is silent on the issue of whether it is
necessary to apply a BNA to the site neutral payment rate after
that rate is determined. Accordingly, the Court must move to
*Chevron* Step two and ask whether the Secretary's interpretation
is reasonable.

### b. *Chevron* Step Two

If a court finds that the statute is silent or ambiguous
with respect to a particular issue, then Congress has not spoken
clearly on the subject and a court is required to proceed to the
second step of the *Chevron* framework. *Chevron*, 467 U.S. at 84.
Under *Chevron* step two, a court's task is to determine if the
agency's approach is "based on a permissible construction of the
statute." *Id.* To make that determination, a court again employs
the traditional tools of statutory interpretation, including
reviewing the text, structure, and purpose of the statute. *See*
*Troy Corp. v. Browder*, 120 F.3d 277, 285 (D.C. Cir. 1997)(noting
that an agency's interpretation must "be reasonable and
consistent with the statutory purpose"). Ultimately, "[n]o
matter how it is framed, the question a court faces when
confronted with an agency's interpretation of a statute it

administers is always, simply, whether the agency has stayed within the bounds of its statutory authority." *District of Columbia v. Dep't of Labor*, 819 F.3d 444, 459 (D.C. Cir. 2016)(citation omitted).

The scope of review under both *Chevron* step two and the APA's arbitrary and capricious standard are concededly narrow. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)(stating "scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency"); s*ee also Judulang v. Holder*, 565 U.S. 42, 52 n.7 (2011)(stating the *Chevron* step two analysis overlaps with arbitrary and capricious review under the APA because under *Chevron* step two a court asks "whether an agency interpretation is 'arbitrary or capricious in substance'"). Additionally, in Medicare cases such as this, the "'tremendous complexity of the Medicare statute . . . adds to the deference which is due to the Secretary's decision.'" *Dist. Hosp. Partners*, 786 F.3d at 60 (quoting *Methodist Hospital*, 38 F.3d at 1229); *see also Alaska Airlines, Inc. v. TSA*, 588 F.3d 1116, 1120 (D.C. Cir. 2009) (agency decisions involving "complex judgments about . . . data analysis that are within the agency's technical expertise" receive "an extreme degree of deference")(citation omitted). Ultimately, for such cases, the question for the Court is

whether "the Secretary's methodology [is] a rational interpretation of the Medicare Act to which the Court should defer[.]" *Adirondack Medical Center v. Sebelius*, 29 F. Supp. 3d 25, 28 (D.D.C. 2014).

Plaintiffs make several arguments all of which can be distilled to one question: whether the Secretary's methodology for applying the BNA to the LTCH site neutral payment rate is a reasonable interpretation of the Medicare statute. The parties disagree as to the effect of the application of the BNA to the site neutral rate. Plaintiffs argue that the BNA must be duplicative because the Secretary applies the 5.1 percent BNA reduction when calculating the site neutral payment rate and then again once the rate has been calculated for a total of a 10.2 percent reduction. Pl.s' Mot., ECF No. 21 at 38. Plaintiffs concede, as they must, that the statute which prescribes the formula for determining the IPPS comparable per diem rate (i.e., the site neutral rate) for LTCH cases requires the Secretary to use the IPPS standard amount and the IPPS federal rate for the calculation, both of which include a BNA. *Id.* at 39. However, plaintiffs argue, nowhere in the statute does it "say to use the outlier BNAs" that are applied to those two calculations "nor does it say to apply a separate BNA for outlier payments." *Id.* The more reasonable approach, plaintiffs argue, would be to either apply the negative 5.1 percent reduction to the IPPS rate

29

when calculating the site neutral payment rate, or apply the 5.1 percent to the final equation (the IPPS comparable per diem amount without the BNA adjustments incorporated into the federal rate and capital rate), but not both. *Id.* 42–43.

The Secretary argues that plaintiffs misunderstand the function of the IPPS BNA which is reflected in the site neutral rate. Def.'s Cross-Mot, ECF No. 22 at 40. The Secretary further explains that the IPPS BNA does not, and cannot, account for the LTCH HCO because the IPPS is an altogether different payment system than the LTCH PPS. *Id.* at 40–41. Rather, the Secretary argues the IPPS reflects high cost outlier payments within IPPS, but does not relate to the estimated amount CMS will pay for HCOs related to the lengthier, more costly, LTCH stays. *See id.* at 41.

The Court cannot conclude that the Secretary's explanation for why he applies the BNA to the site neutral rate when analyzing budget neutrality was an unreasonable or otherwise arbitrary and capricious interpretation of 42 U.S.C. § 1395WW(m)(6)(B)(ii). In coming to this determination, the Court recognizes that CMS has substantial discretion in implementing the budget neutrality adjustment. *See* BIPA, Pub. L. No. 106-554, § 307(b)(1), 114 Stat. 2763, 2763A497 (2000) (codified at 42 U.S.C. § 1395ww, note)(granting discretion to the Secretary to "provide for appropriate adjustments to the long-term hospital

payment system"); *Adirondack Med. Ctr.*, 782 F.3d at 710
(addressing the Secretary's "wide discretion" in "determining
how to meet Medicare's budget neutrality requirements" in IPPS).

As the CMS has explained, while "the IPPS base rates that
are used in site neutral payment rate calculation include a
budget neutrality adjustment for IPPS HCO [high cost outlier]
payments, that adjustment is merely a part of the calculation of
one of the inputs (that is, the IPPS base rates) that are used
in the LTCH PPS computation of site neutral payment rate." 80
Fed. Reg. at 49622. Critically, CMS has articulated its
reasoning for its view that the BNA that is incorporated into
the formula to determine the IPPS comparable per diem amount
does not account for LTCH outlier payments : "[t]he HCO budget
neutrality factor that is applied in determining the IPPS base
rates is intended to fund estimated HCO payment made under the
IPPS," and "[a]s such, the HCO budget neutrality factor that is
applied to the IPPS base rates does not account for the
additional HCO payments that would be made to site neutral
payment rate cases under the LTCH PPS." *Id.*

The Secretary determined that to maintain budget neutrality
within LTCH PPS, it is not sufficient to merely rely on
adjustments incorporated into certain of the inputs for the
calculation of the site neutral payment rate which account only
for outliers in IPPS hospitals. The Secretary's solution to this

problem was to adjust for outlier payments in LTCH PPS, by
adjusting the site neutral payment rate amount itself. 42 C.F.R.
§ 412.522(c)(2). As CMS further explained, "[w]ithout a budget
neutrality adjustment when determining payment for a case under
the LTCH PPS, any HCO payment payable to site neutral payment
rate cases would increase aggregate LTCH PPS payments" to a
level that disrupts budget neutrality. Such a result would
violate the congressional mandate to maintain budget neutrality.
BBRA, Pub. L. No. 106-113, § 123, 113 Stat. 1501, 1501A330
(1999)(codified at 42 U.S.C. § 1395ww, note)(stating that the
LTCH PPS "shall maintain budget neutrality.").

Although Plaintiffs take issue with CMS's classification of
the IPPS BNA as an 'input' to determine the site neutral rate,
their problem is with Congress not CMS. It was Congress that
determined that those would be the inputs to the site neutral
rate calculation. 42 U.S.C. § 1395ww(m)(6)(B)(ii)(stating that
the operating IPPS standardized amount and the capital IPPS
Federal rate would be used for the calculation of the per diem
comparable amount). Plaintiffs argue that Congress was not aware
that the Secretary would budget neutralize the high cost outlier
payments made to site neutral payment cases. *See* Pl.s' Mot., ECF
No. 21 at 27. But Congress conferred broad authority on CMS and,
given CMS's longstanding practice of budget neutralizing outlier
payments throughout the various Medicare payment systems,

including within the LTCH PPS (for standard Federal rate cases).

Under this backdrop, Congress expected the Secretary to do so in

site neutral case payments as well. Indeed, Congress required

the Secretary to calculate site neutral payment rates using

amounts that incorporate the IPPS BNA. 42 U.S.C. §

1395ww(m)(6)(B)(ii).

Furthermore, as the Secretary has explained, the term "IPPS

comparable per diem amount" was not new when Congress, in 2013,

directed CMS to compute that amount using the calculation

described at 42 C.F.R. § 412.529(d)(4). 81 Fed. Reg. at 57308.

That regulation has been used since 2006 to calculate short stay

outlier ("SSO") payments. *Id.* Short stay outliers are cases

where the length of stay is significantly less than the average,

42 C.F.R. § 412.529(a), and those cases may be eligible for high

cost outlier payments if their costs are sufficiently high, *id*.

§ 412.525(a). To maintain budget neutrality for high cost

outlier payments for SSO cases (and also for high cost outlier

payments for non-SSO standard Federal rate cases), CMS applies a

BNA to the standard Federal rate, reducing it by 8%. *id*. §

412.523(d)(1). CMS does so even though the short stay outlier

calculation uses inputs that already reflect an application of

the IPPS BNA. Congress was well aware of how CMS had implemented

the "IPPS comparable per diem amount" language in the short stay

outlier context. Thus, in using that same term to define the

33

site neutral payment rate and in providing that the IPPS
comparable per diem amount is to include "any applicable outlier
payments," Congress presumably understood that CMS would budget
neutralize the high cost outlier payments for site neutral
cases, just as CMS had been doing for years for SSO cases. *See
Lorillard v. Pons*, 434 U.S. 575, 581 (1978) ("[W]here, as here,
Congress adopts a new law incorporating sections of a prior law,
Congress normally can be presumed to have had knowledge of the
interpretation given to the incorporated law, at least insofar
as it affects the new statute.").

Moreover, even assuming an alternative approach to budget
neutrality in LTCH PPS exists and could be considered preferable
to the Secretary's approach, an agency "is not required to
choose the best solution, only a reasonable one." *Petal Gas
Storage, L.L.C. v. FERC*, 496 F.3d 695, 703 (D.C. Cir. 2007); *see
also North Carolina v. FERC*, 112 F.3d 1175, 1190 (D.C. Cir.
1997)(stating that although certain estimates an agency used may
have been less reasonable than other available data, "the fact
that these estimates were less 'reasonable' does not necessarily
make them unreasonable or arbitrary"). For these reasons, the
Court concludes that the Secretary reasonably determined that
the BNA for site neutral payments is an "appropriate
adjustment[]" that maintains budget neutrality within LTCH PPS.
BIPA, § 307(b)(1); *see also Entergy Corp. v. Riverkeeper, Inc.*,

556 U.S. 208, 218 (2009) (the agency's "view governs if it is a reasonable interpretation of the statute—not necessarily the only possible interpretation, nor even the interpretation deemed *most* reasonable by the courts.").

Plaintiffs make several arguments that require minimal attention by the Court because they all rest on the faulty premise that the Secretary has applied a duplicative BNA. First, plaintiffs' argument that the Secretary failed to take a hard look at the issue is belied by the extensive responses during the notice and comment period. Second, plaintiffs' argument that the Secretary's decision to apply the BNA is internally inconsistent is based on the flawed assumption that the challenged BNA reduces site neutral payments to a level that is below the budget neutral baseline. Finally, plaintiffs' general argument that the Secretary made a clear error of judgment fails because the plaintiffs have not identified an error "so clear as to deprive the agency's decision of a rational basis." *See Ethyl Corp v. EPA,* 541 F.2d 1, 34 n.74 (D.C. Cir. 1976).[5]

---

[5] Plaintiffs also argue that the Secretary's decision was not supported by substantial evidence. This standard, however, "does not apply in the rule making context. *See Select Specialty Hosp. Akron, LLC v. Sebelius*, 820 F. Supp. 2d 13, 27 (D.D.C. 2011) (stating substantial evidence standard only applies to agency findings of fact made after a hearing). Indeed, there is no evidence or findings of fact for this Court to review in this case.

## C. Federal Law Claims

The Court will briefly address plaintiffs' arguments that
the Secretary's interpretation violates federal law. Plaintiffs
principal arguments are that the BNA violates the Social
Security Act's dual-rate structure, and that it violates
Medicare's prohibition on cost-shifting. Pl.s.' Mot. ECF No. 21
at 56–57.

Plaintiffs first argue that, by applying an alleged
duplicative BNA, the Secretary is paying LTCH site neutral cases
at a rate other than the site neutral rate contemplated by the
statute. *Id.* at 57. Further, plaintiffs argue, because LTCHs
alleged may receive lower payments to which they are entitled
the Secretary's methodology violates the statutory mandate that
site neutral payments be comparable to IPPS payments when
compared to a per diem basis. *Id.* The problem with this argument
is that the statute does not require exact payment equality but
rather just comparable payments. Indeed, the statutory
requirement in 42 U.S.C. § 1395ww(m)(6)(B)(ii) that CMS pays the
estimated cost for the services involved for a site neutral case
if that cost is lower than the comparable IPPS per diem amount
already creates a differential. *See* 80 Fed. Reg. at 49619.
Moreover, when Congress wants LTCHs to be paid equivalently to
IPPS hospitals it has used clear language requiring identical
payments. *See* 42 U.S.C. § 1395ww(m)(6)(C)(directing hospital to

pay, in certain circumstances, "amount that would apply under [the subsection pertaining to IPPS hospitals] for the discharge if the hospital were a [IPPS hospital.]").

Plaintiffs second argument is that the Secretary violates Medicare's prohibition on cost-shifting. Pl.s' Mot. ECF No. 21 at 57. This prohibition mandates that the costs of delivering services may not be borne by individuals who are not covered by Medicare. 42 U.S.C. § 1395x(v)(1)(A). Plaintiffs argue that the allegedly duplicative BNA violates the cost-shifting prohibition because it results in Medicare costs being borne by non-Medicare beneficiaries. However, the cost shifting prohibition applies only to reimbursements based on "reasonable costs" and therefore is not relevant to this case. *See* 42 U.S.C. § 1395x(v)(1)(A)(explaining that in determining reasonable costs the necessary costs of efficiently delivering covered services will not be borne by individuals not covered by Medicare); *see also Abington Crest Nursing & Rehab. Ctr. v. Sebelius*, 575 F.3d 717, 720 (D.C. Cir. 2009). Moreover, plaintiffs cite no evidence that shows that any costs are borne by non-Medicare beneficiaries due to the Secretary's methodology for budget neutrality.

In sum, plaintiffs have failed to show that the Secretary's interpretation of the Medicare statue was unreasonable or otherwise contrary to law. The Secretary has provided reasoned

explanations for his view that failure to apply a BNA to the site neutral rate for LTCHs will result in a failure to account for HCOs in those settings. Although plaintiffs may disagree with the Secretary, they have not shown that his policy is "unworthy of deference, inadequately explained, or an unreasonable decision disconnected from the realities of hospital reimbursements under Medicare." *See Adirondack Med. Ctr.*, 29 F. Supp. 3d at 43. Accordingly the Court **GRANTS** defendant's cross-motion for summary judgment and **DENIES** plaintiffs' motion.

## IV. Conclusion

For the foregoing reasons the Court **GRANTS** defendant's cross-motion for summary judgment, and **DENIES** plaintiffs' motion.

**SO ORDERED.**

**Signed:**     **Emmet G. Sullivan**
             **United States District Judge**
             **September 30, 2019**